1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| CHRISTOPHER DALE SMITH, | Civil No. 10cv2429-LAB (WMc) |
|---|---|
| Petitioner, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| LARRY SMALL, Warden, et al., | |
| Respondents. | |

This Report and Recommendation is submitted to United States District Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Christopher Dale Smith (hereinafter "Petitioner" or "Smith"), is a state prisoner proceeding *in pro per* with a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  On June 13, 2013, Defendants filed an Answer to the Petition.  (ECF No. 25.)  Although Petitioner received an extension to file a Traverse no later than October 17, 2013, he failed to do so.  [ECF No. 29.]

///
///

-1-

## II.

### STATE PROCEEDINGS

On December 20, 2006, Petitioner was convicted by a jury of one count of forcible rape ([Cal.] Pen. Code, 261, subd. (A)(2)) and two counts of forcible oral copulation (§288a, subd. c(2)), burglary of an inhabited dwelling while a person was in the residence (§§ 459, 460, 667.5, subd. C(21)) and false imprisonment by violence or menace (§§ 236, 237, subd. (a)).  The jury made true findings that the sex offenses occurred during a burglary with an intent to commit rape (§ 667.61, subds. (a)(c)(d)) and that Smith used a deadly weapon during those offenses (§§ 12022.3, subd. (A); 667.61, subds. (b)(c)(e)).  Smith was sentenced to an indeterminate term of 25 years to life and a determinate term of 24 years. *See* Lodgment No. 4, *People v. Smith*, No. D050031, 2008 WL 1735380, *1-2 (Cal. App. 4 Dist. April 16, 2008).

## III.

### FACTUAL BACKGROUND

The following statement of facts is taken from the unpublished appellate court opinion affirming Petitioner's conviction on direct review.  This Court gives deference to state court findings of fact and presumes them to be correct.  *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

"In November 2005, A.V. was a nursing student from Boston living in San Diego while she completed an internship with a local hospital.  She shared an apartment with another nursing student from Boston.  She and her roommate worked at the hospital from about 7:00 a.m. to 7:30 p.m., with 30 to 60 minute lunch breaks that had to be taken before 2:00 p.m.

Starting Sunday, November 6, A.V. became ill.  She had almost constant cough and an ear infection, but she worked on Monday, Tuesday and Wednesday.  Although she planned to eat lunch on Monday with her roommate and her roommate's visiting friend, A.V. had to sit with a patient and ate alone in the hospital cafeteria about 1:00 p.m.  A fellow employee, 'Manny,' covered for her while she ate lunch.

On Wednesday, after she finished her shift, A.V. went to the emergency room in the hospital with a fever, high blood pressure and a high heart rate.  She was diagnosed with pneumonia, given antibiotics and I.V. fluid and told not to work for the next three days.  On Thursday, November 10, she stayed home sick.  When her roommate left at about 12:30 or 1:00 p.m., A.V. was 'really pale, 'very sluggish' and had an even worse cough.  She was in her bedroom with the

door closed.  About 4:00 p.m., A.V. took out the trash, leaving the apartment door unlocked.

When she returned to her apartment, she found Smith standing in her bedroom.  She screamed and jumped back.  He said he was not going to hurt her, but then he showed her a knife, threatened her, and told her to get in the closet.  In a matter-of-fact tone of voice he said, 'I'm going to have sex with you.'  Once inside the closet, he had her remove her clothes, then forced her to orally copulate him, he orally copulated her and finally, he raped her.

When he finished, he told her to get up and get dressed.  She dressed and told him to leave.  He told her to take off her clothes because he wanted 'to do' her again.  She collapsed to the floor crying.  He started crying too saying he had never done this before and that he was married and loved his wife.  She talked to him, using 'therapeutic communication' she had learned in nursing school.  He asked if she were going to call the police.  When she said she was, he begged her not to do s, and attempted to excuse his conduct by saying he had ADHD.  He offered to return the next day and pay her $500 but she told him to leave.

As soon as he left, A.V. locked the door and called the police.  She also called her roommate.  During the phone call to her roommate, she was crying and upset and said she had been raped.  When the police arrived, A.V. was still crying and was hysterical.  She described the knife Smith used and said she thought it might be one of her knives.  There was a knife missing from the knife block in the kitchen.  The officers took her to the hospital for an examination during which she cried intermittently.  The examining nurse found genital injuries that were consistent with A.V.'s description of the rape.  These injuries, however, were also consistent with consensual intercourse.

A DNA analysis was conducted on semen recovered from A.V. and carpet in the walk-in closet.  An expert testified Smith was 'very likely' the contributor of the semen.  FN2.

> FN2.  The expert quantified her results, for example, stating that the semen on the vaginal swab could have been contributed by 1 in 10 quintillion Caucasians, 1 in 390 quintillion African Americans, or 1 in 150 quintillion Hispanics.

The police contacted one of A.V.s upstairs neighbors, Ashley Apgar.  Apgar was awakened by the police knocking on her door.  There was a UPS package sitting on the ground next to her front door.  UPS trains its personnel not to leave packages by the front doors of residences that share walkways because of the danger the package might be stolen.  Instead, UPS personnel are supposed to leave a tag on the door to let the customer know a delivery was attempted, and, if possible leave the package at the front desk, management office or with a neighbor.  Smith, who worked for UPS had delivered the package to Apgar at 3:53 or 3:54 p.m.

The police contacted Smith the next day, Friday, November 11.  Smith admitted he had sex with the 'girl' FN3 who had reported the rape, but claimed it was consensual.  He claimed he had first met her on Friday outside her apartment and they flirted on that day as well as on Monday and Tuesday.  He said they 'had a relationship,' but then said they were not dating but once had lunch together.  When asked when the lunch occurred, he first said 'two days ago,'

-3-

which would have been Wednesday, November 9, but then said lunch was on Monday. He said he had seen her at her apartment and asked her out to lunch that day. He told the police that he believed A.V. was claiming he raped her because she was upset about learning he was a married man.

FN3. Smith never used A.V.'s name during the interview.

An expert in forensic science testified proper investigative procedures require collecting bedding material because that is a typical place for consensual sex, but police failed to do that in this case.

**Prior Acts**

*Hanna Orr-Ziv*

On December 3, 2004, Hanna Orr-Ziv brought her car to a dealership for service. She received a ride home in the dealership's courtesy van. Smith was the driver. When they approached her home, Smith asked to use her bathroom. She agreed, but she was unable to open her front door because she had bolted it shut from inside. As they unsuccessfully tried to enter the house through a window, Smith commented that it was a pity her husband was not at home. Orr-Ziv said her husband was out of town and they would have to return to the dealership so she could get the remote control for the garage and enter the house through the garage door. As they were returning to the dealership, Smith called ahead to make sure the remote would be ready to pick up when they arrived.

At the dealership, Smith went inside and retrieved the remote. Orr-Ziv asked if he had a chance o use the restroom at the dealership and told him she was not in a hurry. Smith said he did not need to use the restroom, explaining 'it comes and goes.' As they approached her house, Orr-Ziv offered the use of her bathroom. Smith accepted her offer and followed her into the house. After using the bathroom, Smith went to his van but returned, claiming he had lost his keys and asked if he could look in the bathroom. He was in the bathroom for two or three minutes, said he did not find his keys and, at her suggestion, went to look in the van. About two minutes later, he returned, claiming they were stuck under the driver's seat and asked to use her phone so he could call the office for assistance; he claimed his cell phone was not working. She directed him to the phone in the kitchen. She saw him pick up the phone but did not hear him talk. He claimed he was put on hold. She told him she had errands to run and could not wait any longer. She offered the use of her cell phone outside the house and started walking toward the garage with Smith following her. While still inside the house, he started strangling her with his right arm or hand. She screamed. He put his left hand over her mouth and tried to pull her towards him. She bit his finger. He released her and she ran through the garage out to her driveway. She told him not to flee and said she was calling the police. He knelt down, said he had not wanted to do anything, and while pointing to his wedding ring, said he was a married man. A neighbor, who had heard Orr-Ziv screaming, came over and took Smith to his house while the police were called. Smith was arrested and charged with crimes, but was acquitted.

Smith testified that as he followed Orr-Ziv out of the house, she knelt on the ground to retrieve something out of her bag. As he walked past her, he reached over her shoulder to shake her hand. His forearm 'kind of hit her cheek and

-4-

shoulder' and she screamed.  He put his hands on her shoulder and said, 'It's okay' repeatedly, but she bit his finger.

*Ashley Apgar*

On Friday, November 4, 2005, Smith was working his third day as a UPS driver.  He had four packages to deliver to Apgar who was eight months pregnant and lived upstairs from A.V.  He first delivered one of the smaller packages.  He asked if her husband was home because there were a lot of packages and he needed help carrying them.  He delivered the packages one at a time.  He asked if he could bring the two heavy packages inside but she told him no.  He also asked to use her bathroom.  She said no.  His questions about whether her husband was home and asking to sue her bathroom made her feel so uncomfortable that she called her husband after Smith left to tell him what had happened.

**Defense**

Smith testified that he first met A.V. the previous Wednesday, November 2.  They flirted with each other.  He next saw her on Friday, November 4, when she was standing at her front door.  They talked and flirted.  They agreed to meet for lunch at a fast food restaurant on Monday, November 7, at about 2:00 p.m.  She met him there shortly after 2:00 p.m.  She was flirty and friendly, but they did not make any specific arrangements to meet each other again.

On Thursday, November 10, Smith knocked on A.V.'s door after delivering a package to Apgar.  He told her he was taking a break and she invited him into the apartment.  After getting him a glass of water, she led him to the bedroom and sat down on the bed.  After talking for awhile, then kissing, they eventually engaged in consensual sex acts after A.V. stood up to put something in her closet.  When they were finished, he felt bad because he had cheated on his wife.  He told her he was married.  A.V. was mad and hurt and threatened to tell his wife.  He offered to pay her $500 if she would not tell his wife, but she refused the money and told him to leave.

One of A.V.'s coworkers Manik Uppal, testified he covered for A.V. for a lunch break that lasted 45 to 50 minutes, rather than the usual break of 30 minutes.  On cross-examination, Uppal testified he could not remember the date but it was sometime toward the end of 2005, A.V. returned with another woman who was not wearing hospital attire, the lunch break was about noon, or before 1:00 p.m. and had lasted about 45 minutes."

*See* Lodgment No. 4, *People v. Smith*, No. D050031, 2008 WL 1735380, *1-4 (Cal. App. 4 Dist. April 16, 2008).

///

///

///

///

# IV.

## PETITIONER'S CLAIMS

The Petition presents the following claims:

(1) The trial court denied Petitioner his Sixth and Fourteenth Amendment rights to present a defense by excluding testimony from Dr. Joyce Adams, Nurse Cari Caruso and Petitioner's wife;

(2) Petitioner's due process rights under the Fifth, Sixth and Fourteenth Amendments were violated because the trial court's multiple evidentiary errors rendered the trial fundamentally unfair; and

(3) Petitioner was denied his Sixth Amendment right when his appellate counsel failed to raise the trial court's exclusion of defense evidence and resulting cumulative error on appeal.

(*See* Pet. Mem., ECF No. 1 at 6-8.)

# V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief.  The Court therefore **RECOMMENDS** the Petition be **DENIED**.

**A.    Standard of Review**

This action was initiated after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." *Williams*, 529 U.S. at 412. In order to satisfy section 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011). The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." *Id.* at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B. Constitutional Right to Present a Defense**

Petitioner argues his federal constitutional right to present a defense was violated when the trial court judge would not permit: (1) Nurse Cari Caruso to testify regarding the amount of false reporting in sexual assault cases; (2) Dr. Joyce Adams to testify that the sexual lesions incurred by the victim were minor; and (3) Plaintiff's wife to testify about his "innocent" demeanor after the alleged rape. [ECF No. 1 at 3; ECF No. 1-1 at pp. 1-5.]

Respondent argues the trial court properly excluded: (1) the testimony of Nurse Caruso because it was confusing and of limited relevance; (2) the testimony of Dr. Adams because it was cumulative; and (3) the testimony of Plaintiff's wife because it was irrelevant. [ECF No. 25 at 16-17.]

Plaintiff failed to raise the trial court's exclusion of this various testimony on direct appeal, and instead challenged the trial court's exclusionary rulings in his first state habeas corpus petition. [*See* Lodgment 7 and 11.] The state superior court denied Plaintiff's Petition on November 23, 2009 finding rulings of the trial court may not be reviewed on habeas corpus. [Lodgment No. 8 at 3.] Smith again

1   challenged the trial court's exclusionary rulings in a petition filed in the California

2   Court of Appeal on December 23, 2009. [Lodgment No. 9 at 3.]  The state appellate

3   court addressed the merits of Smith's claim and denied the petition. [Lodgment No.

4   10.]   On April 28, 2010, Plaintiff filed a petition for habeas corpus with the California

5   Supreme Court.  [Lodgment No. 11.] The California Supreme Court summarily denied

6   the petition on November 23, 2010.  [Lodgment No. 12.]  Where there is no reasoned

7   decision from the state's highest court, the Court "looks through" to the underlying

8   appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

9   dispositive state court order does not "furnish a basis for its reasoning," federal habeas

10   courts must conduct an independent review of the record to determine whether the

11   state court's decision is contrary to, or an unreasonable application of, clearly

12   established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.

13   2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v.

14   Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  A state court, however, need not cite

15   Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537

16   U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court

17   decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not

18   be "contrary to" clearly established federal law.  *Id.*

19        Here, the state appellate court addressed the merits of Smith's evidentiary error

20   claim stating:

21   "Smith also contends that the trial judge erred in excluding testimony of three
    proposed defense witnesses.  Specifically, Smith sought to introduce testimony

22   of a nurse, a doctor and his wife.  According to Smith, the nurse [FN1] would
    have testified that approximately 30 percent of her patients later recanted their

23   sexual assault allegations or were shown to have made false reports.  The judge
    excluded this evidence, concluding that it offered no probative value as to the

24   credibility of Smith's victim.  The doctor would have testified that the victim's
    abrasions were minor and could have been caused by a number of things,

25   including consensual or nonconsensual intercourse.  The judge noted that
    testimony to this effect had already been introduced and that these issues were

26   not contested.  He excluded the testimony as cumulative.  Smith's wife would
    have testified that Smith's demeanor when he was charged with the crime was

27   consistent with that of an innocent man.  Apparently concluding this testimony
    was irrelevant, the judge excluded it."

28

FN1.  Smith describes the nurse as a "Sexual Assault Nurse."  There is no indication that she attended to Smith's victim.

To succeed on this ground, Smith must show that the evidence was erroneously excluded and that such error 'resulted in a miscarriage of justice.'....  Smith has made no such showing.  He argues that he has a fundamental right to present witnesses in his defense and that all relevant evidence is admissible, but he does not explain why the proposed testimony is relevant or probative of the contested issues in his case."

[*See* Lodgment 10 at 1-2.]

There is no constitutional right to present evidence that is irrelevant or otherwise inadmissible under evidentiary rules of procedure.  *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992); *see also Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).  In determining whether a constitutional violation occurred, the court first inquires whether the excluded evidence was relevant.  If it was not relevant, the defendant had no constitutional right to present it.  *Wood*, 957 F.2d at 1549 ("A defendant has no right to present irrelevant evidence," and "[i]t is within the trial court's discretion to determine which issues are relevant"), *citing United States v. Torres*, 937 F.2d 1469, 1473 (9th Cir. 1991). The exclusion of irrelevant evidence, even when proffered as a defense, raises no constitutional concern.

If the excluded evidence was relevant, the court determines whether other legitimate interests outweighed defendant's interest in presenting it.  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and such rules "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' "  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted).

### 1.  *Nurse Cari Caruso*

Defense counsel sought the Court's leave to allow Nurse Caruso to testify that "between 12 and 30 percent" of approximately 200 sexual assault cases she or her colleagues worked on indicated "the victim herself had recanted or the investigation showed this was a false report." [Reporter's Transcript, Lodgment 14 at 1028.]  The

1   trial court exercised its discretion under California Evidence Code § 352 to exclude

2   any testimony regarding the percentage of false reporting because the testimony was

3   largely irrelevant and any probative value it may have had was minor compared to the

4   confusion of issues such testimony might create.  The trial court explained:

5       "You know, ultimately I think the vice of this kind of evidence is that it deflects
        the trier of fact from judging the facts in this case.  What happened in 70
6       percent or 67 percent or 30 percent or 33 percent of other cases on some recent
        year in the past in another jurisdiction I think is not relevant to the duty of the
7       trier of fact to find the facts based on the evidence of this case.  They're
        supposed to look at the witnesses in this case; they're supposed to consider the
8       evidence in this case.  It seems to me that the statistical probability of false
        reporting should be no more admissible than, for instance, if the people sought
9       to bring in somebody who would testify that, on cases filed by the district
        attorney's office alleging rape where there was a claim of consent, there was a
10      conviction obtained in 80 or 90 or 50 or 60 percent of the cases.  It's not
        relevant to the assessment of evidence in this case.

11
        More than that, I share the concerns of [the prosecutor] Ms. Diaz with respect to
12      the protocols involved.  I am mindful of the pronouncements of the fourth
        district in Lorsak v. Atlas Hotels.  This was a case I believe I cited in our first
13      trial in this case with respect to Mr. Turvey's testimony.  And that case
        addresses, among other things, the sources of information that may be validly
14      relied upon.  And follow-up with detectives and talking to other experts or
        polling, I think, of other experts around the country I don't think qualifies.
15
        I am concerned as well that we have rules that say that witnesses may not offer
16      opinions on the ultimate issue to be decided by the trier of fact.  Witnesses may
        also not pass credibility judgments.  We may not receive testimony from a
17      witness as to the credibility or as to whether somebody was raped or not based
        on credibility determinations.  I am concerned that this kind of evidence is
18      easily susceptible of being used as a vehicle to put before the jury inadmissible
        opinions on whether the attack occurred or on the credibility of witnesses.
19
        Finally, I think we all know that there are a whole variety of reasons that cases
20      don't get issued or don't get prosecuted or in some fashion drop out of the
        system.  In some cases victims recant truthfully.  In other cases victims recant
21      falsely.  In other cases victims don't want to bear the stress and trauma of
        prosecution.  There may be evidentiary concerns.  There may be assessments
22      where victims say that, 'I'm not wiling to go through this process regardless of
        what happened.'  For us to thrash all that out would, I think, clearly implicate
23      section 352 of the evidence of code.  The time and confusion vastly outweigh
        any probative value that the evidence might have, as I've indicated, frankly.
24      Fundamentally, I don't think there is a probative value to that evidence.

25      In any event, the Court's ruling will stand.  We're not going to hear testimony
        of the subject."
26
    [See Lodgment 14 at 1029-1031.]
27

28

                                        -11-

1    Smith has failed to show that the exclusion of Nurse Caruso's testimony was

2  fundamentally unfair.  *See Bueno v. Hallahan*, 988 F.2d 86, 87 (9th Cir. 1992)(per

3  curiam)(explaining "[a] state court's evidentiary ruling is grounds for federal habeas

4  corpus relief only if it renders the state proceeding so fundamentally unfair as to

5  violate due process.")  Specifically, the probative value of Nurse Caruso's opinion

6  that between 12 and 30 percent of the sexual assault cases she had handled were the

7  result of false reporting was minimally relevant, if relevant at all, in light of the fact

8  that Nurse Caruso's percentages were compiled from all manner of cases in general

9  with no attempt to establish similar facts occurring in the victim's case and those cases

10  where false reporting was noted.  In addition, Nurse Caruso's opinion was based on

11  anecdotal evidence which brought its reliability into question.  Moreover, as the trial

12  judge aptly noted, a determination regarding the victim's credibility on the issue of

13  whether intercourse was consensual or not was the ultimate issue in the case and

14  solely the province of the jury.  Opinion testimony regarding false reporting and its

15  hallmarks would have impermissibly tread on the jury's function and confuse, rather

16  than assist, the jury in making its credibility determination.  It is well-established that

17  "the Constitution permits judges 'to exclude evidence that is repetitive ..., only

18  marginally relevant' or poses an undue risk of 'harassment, prejudice, or confusion of

19  the issues.'"  *See Holmes v. South Carolina,* 547 U.S. 319, 326-27, 126 S. Ct. 1727,

20  164 L.Ed.2d 503 (2006)(quoting *Crane v. Kentucky*, 476 U.S. 683, 689-690, 106 S.

21  Ct. 2142, 90 L.Ed.2d 636 (1986).  Accordingly, the conclusion of the state appellate

22  court that the testimony was properly excluded by the trial judge in light of its

23  minimal probative value is neither contrary to, nor an unreasonable application of,

24  established federal due process principles.  Moreover, the exclusion of Nurse Caruso's

25  testimony did not render Smith's trial fundamentally unfair or prevent him from

26  presenting his defense.  In support of Smith's contention that the sexual contact he

27  engaged in with the victim was consensual, Nurse Caruso testified at trial that the

28  physical findings reported in the victim's exam could have been caused by consensual

-12-

sex [Reporter's Transcript, Lodgment 14 at 992] or conditions other than sexual contact.  [*Id*. at 994.]  Nurse Caruso also testified that the victim's vaginal injury was minor.  [Reporter's Transcript, Lodgment 14 at 994.]  Thus, the Court **RECOMMENDS** the Court find the exclusion of Nurse Caruso's proffered testimony does not constitute a violation of due process warranting federal habeas relief.

### 2. Dr. Joyce Adams

Defense counsel sought to present the testimony of Dr. Joyce Adams on the severity of the victim's vaginal lesions and whether the results of the victim's exam were consistent with activities other than non-consensual sex.  [Reporter's Transcript, Lodgment 14 at 1138.]  The trial court exercised its discretion under California Evidence Code § 352 to exclude any testimony by Dr. Adams because it was cumulative and not offered to support a fact in contention.   [Reporter's Transcript, Lodgment 14 at 1142.]  The trial court stated:

> "I don't believe that the offer of proof that you have given me addresses any issue as to which there is any dispute of the evidence in the record.  I'm also mindful of the fact that Ms. Caruso testified, I believe, to the effect that doctors aren't particularly interested in performing these exams because they take so long and that's why nurses have become specialists in doing it.  It seems to me that the three areas[1] that you have given offers of proof on are areas in which both the people's witnesses and the defense witness, Ms. Caruso, substantially agree.  The Court therefore finds that Dr. Adams' testimony would be cumulative and is subject to exclusion under section 352.
>
> Any probative value, while she may be a wonderful expert, is little to none because the issues aren't factually disputed.  All of the evidence in the record is in substantial accord as to those three areas.
>
> Therefore it's cumulative and would be an undue consumption of time, and the court excludes her testimony."

---

[1]  When asked by the court for an offer of proof as to what Dr. Adams' testimony would be, defense counsel stated: "[I]t will be that she has familiarity with sexual assault exams; that she's performed them in the past.  She has reviewed the forensic medical examination report and seen the photographs. And then to offer some opinions on the nature of the lesions or abrasions or injuries." [Reporter's Transcript, Lodgment 14 at 1138-39.]  The Court asked for a more specific description of the Dr. Adams' anticipated testimony, defense counsel indicated she would testify that the victims lesions were minor [*Id*. at 1139]; the abrasions were not visible to the naked eye without stain and were consistent with consensual or nonconsensual sex [Id.]; that the abrasions could have been caused by something other than intercourse. *[Id.* a 1140.]

1    [*See* Lodgment 14 at 1141-1142.]

2
3    As explained in section B.2, *supra*, of this Report & Recommendation on the

4    issue of the trial court's exclusion of Nurse Caruso's testimony, "the Constitution

5    permits judges 'to exclude evidence that is repetitive ..., only marginally relevant' or

6    poses an undue risk of 'harassment, prejudice, or confusion of the issues.'" *See*

7    *Holmes,* 547 U.S. at 326-27.  Here, Dr. Adams' testimony would have clearly been

8    cumulative of testimony already given by defense witness Nurse Caruso to the effect

9    that the abrasions documented in the victim's physical exam were minor and could

10   have been caused by consensual sex, nonconsensual sex or other activities.

11   [Reporter's Transcript, Lodgment 14 at 992-994.]  Accordingly, the state appellate

12   court's finding that the testimony was properly excluded because its probative value

13   was minimal in light of the fact that defense testimony regarding the severity and

14   nature of the victim's exam results had already been introduced, is neither contrary to,

15   nor an unreasonable application of, established federal due process principles.  *See*

16   *Holmes,* 547 U.S. at 326 (explaining "[w]hile the Constitution thus prohibits the

17   exclusion of defense evidence under rules that serve no legitimate purpose or that are

18   disproportionate to the ends that they are asserted to promote, well-established rules of

19   evidence permit trial judges to exclude evidence if its probative value is outweighed

20   by certain other factors such as unfair prejudice, confusion of the issues, or potential

21   to mislead the jury.")

22   In addition, the exclusion of Dr. Adams' testimony did not render Smith's trial

23   fundamentally unfair or prevent him from presenting his defense.  In support of

24   Smith's contention that he and the victim had consensual sex, he had already

25   introduced the testimony of defense witness Nurse Cari Caruso whose opinion that the

26   victim's minor abrasions could have also been caused by consensual sex  or

27   conditions other than sexual contact was uncontroverted.  [Reporter's Transcript,

28   Lodgment 14 at 992-994.]  Thus, **IT IS RECOMMENDED** the Court find

the exclusion of Dr. Adams' proffered testimony does not constitute a violation of due process warranting federal habeas relief.

### 3. *Smith's Wife*

During the presentation of the defense case, the prosecution sought to exclude testimony by Smith's wife on relevance grounds.  Before the prosecution brought its motion to exclude, defense counsel had notified the prosecutor that it intended to call the Plaintiff's wife in order to describe Plaintiff's demeanor after the alleged rape. [Reporter's Transcript, Lodgment 14 at 1235-36.]  Before ruling on the prosecution's objection to the proffered testimony, the trial court asked for an offer of proof. Defense counsel indicated the proffered testimony would be used to demonstrate "after the time of the alleged incident that Ms. Smith's demeanor was that he was scared, incredulous, upset, hurt, afraid to go to jail for something he didn't do, and that he subsequently told his wife that what happened was consensual."  [*Id*. at 1236.]  In addition, defense counsel argued the testimony of Plaintiff's wife would be relevant to his credibility. [*Id*.]

After hearing from defense counsel, the trial court sustained the prosecution's relevance objection and ruled the testimony inadmissible. [*Id*. at 1136.]  The state appellate court confirmed the trial court's finding, stating: "[Smith] argues that he has a fundamental right to present witnesses in his defense and that all relevant evidence is admissible, but he does not explain why the proposed testimony is relevant or probative of the contested issues in his case." [Lodgment 10 at 2.]

Smith has failed to demonstrate the state appellate court's decision unreasonably applied well-established due process principles.  "[A] defendant has no right to present irrelevant evidence," and "[i]t is within the trial court's discretion to determine which issues are relevant."  *See Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992*) (citing United States v. Torres*, 937 F.2d 1469, 1473 (9th Cir. 1991)). Here, the relevance and probative value of Plaintiff's wife's testimony as to his credibility and whether there was or was not consensual intercourse was infinitesimal.

1    "[I]t is the jurors' responsibility to determine credibility by assessing the witnesses

2    and witness testimony in light of their own experience."  *See e.g. United States v.*

3    *Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002) (quoting *United States v. Sanchez-Lima*,

4    161 F.3d 545, 548 (9th Cir. 1998)).  Smith does not have a constitutional right to

5    substitute his wife's credibility determinations for those of the jury.

6          Moreover, the exclusion of Mrs. Smith's testimony did not render her

7    husband's trial fundamentally unfair or prevent him from presenting his defense.  In

8    support of Smith's assertion that the sex between himself and the victim was

9    consensual, Smith testified in his defense.  On direct examination, he stated: (1) the

10   victim had flirted with him when they met while he was delivering packages at the

11   Archstone apartment complex (Lodgment 14 at 1178:18-1180:14); (2) he knew and

12   had lunch with the victim several days before the alleged rape (*Id*. at 1182:28-

13   1183:20); (3) he was invited into the victim's apartment by the victim on the day of

14   the alleged rape (*Id*. at 1191:19-25); (4) he and the victim kissed each other on her bed

15   on day of alleged rape (*Id*. at 1195:24-28); (5) the victim kissed Smith back while they

16   were standing in front of her closet (*Id*. at 1199:2-17); (6) he never had a knife during

17   his visit to the victim's apartment (*Id*. at 1205:7-12); (7) he did not force the victim to

18   have sex with him (*Id.* at 1207:8-9); (8) after having sex, Smith told the victim he was

19   married and she threatened to find a way to tell his wife he had cheated on her (*Id*. at

20   1208:23-1211:25); and (9) when police contacted Smith at work to talk about the

21   victim's allegations, he answered their questions and cooperated (*Id*. at 1217:14-28).

22   Thus, **IT IS RECOMMENDED** the Court find the exclusion of Smith's wife's

23   proffered testimony did not render his trial fundamentally unfair or prevent him from

24   presenting his defense**.**  Petitioner is not entitled to habeas relief on this claim of

25   evidentiary error.

26   *///*

-16-

## C. Cumulative Error

Petitioner contends the trial court's multiple evidentiary errors rendered the trial fundamentally unfair. (*See* Pet. Mem., ECF No. 1 at 6-8.)  Specifically, in Smith's memorandum of points & authorities in support of his Petition (but not within the four corners of the Petition itself), Smith argues the exclusion of testimony by defense witnesses *as well as the introduction of prior bad acts evidence* violated due process. [ECF No. 1-1 at 7.]

Addressing only the exclusion of defense testimony from Nurse Caruso, Dr. Adams and Mrs. Smith, Respondent contends there were no errors in Smith's case and therefore, his cumulative error claim must fail.  (ECF No. 25 at 20.)

The Ninth Circuit recognizes the possibility that the combined effect of several independent trial errors can have an injurious effect on the jury's verdict even though none of the errors would warrant relief individually.  *See, e.g.*, *Phillips v. Woodford*, 267 F.3d 966, 985-86 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted"), *citing Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir.1992) (per curiam) (holding "significant errors occurred, that considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death," citing Circuit cases recognizing the cumulative impact of multiple deficiencies); *see also Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (holding "the district court did not err in finding that the combined prejudice of the multiple errors committed in this case deprived [petitioner] of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition").  The Ninth Circuit has stated that the cumulative error doctrine is clearly established federal law.

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. 284 (1973) at 298, 302-03 (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even where no single

error rises to the level of a constitutional violation or would independently warrant reversal.  *Chambers*, 410 U.S. at 290 n. 3.

*Parle v. Runnels*, 505 F.3d 922, 927 (9th  Cir. 2007) (footnotes and parallel citations omitted).

Only "substantial" errors which do not warrant relief standing alone are amenable to assessment for their combined prejudicial effect on the fairness of a trial. *Calderon v. Coleman*, 525 U.S. 141, 145 (1998); *see Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.  See *United States v. Larson*, 460 F.3d 1200, 1217 (9th Cir.2006) (rejecting cumulative error claim where we 'discovered no error' in the defendants' trial")).

### 1.  *Admission of Prior Bad Acts Evidence*

At Smith's trial, the jury heard evidence of a 2004 incident in which Smith attempted to accost a female customer during work hours after learning her husband was not at home and gaining entry into her house.  [Lodgement 14 at 606:28-615:25; 620:27-630:25.]  The jury also heard evidence of a 2005 incident in which Smith, while at work, inquired about the whereabouts of a female customer's husband and attempted to gain entry in her home.  [Lodgment 14 at 351:6-353:5.]  Smith contends there was insufficient commonality between the rape and the 2004 and 2005 incidents; therefore, that evidence was not probative of a common plan to rape, was prejudicial and deprived him of due process.  [ECF No. 1-1 at 7:9-24.]

Plaintiff challenged the admission of prior bad acts evidence on direct appeal.  [Lodgment 4.]  The California Supreme Court denied the claim on July 9, 2009.  [Lodgment 5,6.] Thus, the last reasoned state court decision was issued by the Court of Appeal. [Lodgment 4, *Ylst*, 501 U.S. at 801-06.]  The state court of appeal reasonably concluded the trial court did not err in admitting the prior act evidence:

"Smith contends the trial court abused its discretion when it admitted the prior acts to show a common plan, design or motive.  He contends there was insufficient commonality among the charged and uncharged acts.

Evidence Code section 1101 prohibits admission of evidence of a prior bad act by the defendant if its only relevance is to prove the defendant has a propensity to commit crimes; however, section 1101 permits prior bad act evidence to be admitted if relevant to prove some other fact, such as intent, motive or identity. (People v. Balcom (1994) 7 Cal. 4th 414, 422.)  The determination that a prior bad act is relevant does not end the inquiry.  (Id. at p. 426.)  To be admissible, the bad act "'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.'" (Ibid.)  Hence, the court must examine whether the probative value of the prior bad act evidence is "substantially outweighed by the probability that its admission [would] ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code s 352.)" (Id. at p. 427.)...

The erroneous admission of prior bad act evidence will support a reversal of the conviction only if it is reasonably probable that the jury would have reached a more favorable result if the evidence had been excluded.  (People v. Cole (2004) 33 Cal. 4th 158, 1195.)....

Here, the prior acts had some relevance to an issue in the case.  They tended to show that Smith, while working, had a plan of contacting female customer who were virtual strangers to him, ascertaining whether they were alone in their homes, and entering their homes to accost them.  He was unsuccessful in gaining access to Apgar's apartment while she was alone.  He was able to access Orr-Ziv's home and accosted her inside her residence but she was able to escape.  After she escaped, Smith attempted to explain there was a misunderstanding by stating he was a married man.  Here, Smith entered the apartment of A.V., who was a stranger, while she was alone and accosted her inside the apartment.  Unlike Orr-Ziv, A.V. was unable to escape."

[Lodgment 4 at pp. 8-10.]

Moreover, the appellate court's decision explains that even if it had found the trial court erred in admitting insufficiently similar evidence under Evidence Code section 1101, Smith was not prejudiced by its admission stating:

"[E]ven if we were to conclude the prior acts should have been excluded because they were not sufficiently similar to the charged acts, we would not reverse.  The prior bad acts were not unduly inflammatory compared to the charged acts.  In the Apgar incident, Smith never entered the apartment.  In the Orr-Ziv incident, the victim fled immediately after Smith touched her and a jury acquitted him of the charges.  More importantly, as with most sexual assault cases, this case involved a credibility contest between the defendant and the victim, and there was other evidence supporting the victim's version.

There was physical evidence supporting A.V.'s version.  She testified Smith used a knife that looked like a knife she owned.  A knife was missing from her kitchen.  She had injuries that were consistent with nonconsensual sex.  Her conduct after Smith left was consistent with having been raped.  She called the police immediately after he left.  She told both her roommate and mother she had been raped.  After the incident, A.V. was crying and hysterical.

Smith's version of what occurred was impeached by his prior statements to the police.  He told the police he flirted with A.V. at the apartment complex on

-19-

1   Monday, November 7 and Tuesday, November 8.  A.V., however, testified she
2   was working both those days.  At trial, Smith changed his story.  He testified he
    flirted with her only on Wednesday, November 2, and Friday, November 4.
3   Smith initially told the police they had lunch on Wednesday, then he told the
    police that when he saw A.V. at the apartment complex on Monday, he asked
4   her to lunch.  At trial, Smith testified the lunch date was set up on Friday, a day
    A.V. testified she was not working.

5   Additionally, there are certain aspects of Smith's version that do not make
6   sense.  Under Smith's version, at beast, he had chatted with A.V. for a few
    minutes at her apartment and during a 20-minute lunch.  Smith presented no
7   evidence disputing that A.V. was so ill that she had gone to the emergency
    room the night before the incident, was too ill to work, and had been diagnosed
8   with pneumonia.  A.V.'s roommate described A.V. as pale, sick and lethargic
    just a few hours earlier.  Yet, according to Smith, she invited him into her
9   apartment, led him directly into her bedroom, and within a matter of minutes
    was having intercourse with him in her walk-in closet.  This scenario seems
10  unlikely.  Moreover, Smith's explanation that A.V. reported a rape only because
    she had learned he was a married man is inconsistent with her conduct.
11  Numerous people interacted with A.V. shortly after the incident.  She
    consistently stated she had been raped.  The people who saw her did not
12  describe A.V. as being only somewhat upset or angry; they described her as
    being hysterical, crying and barely coherent, hardly the picture of a woman who
    was coldly making a rape charge for revenge.
13
    In sum, we conclude reversal is not merited on the ground the court erred in
14  admitting the prior act evidence."

15  [Lodgment 4 at pp. 10-11.]

16      According to clearly established federal law, state evidentiary rulings are not

17  cognizable in federal habeas proceedings unless the admission of evidence violated

18  the petitioner's due process right to a fair trial.  *Estelle v. McGuire*, 502 U.S. 62, 67-68

19  (1991) ("federal habeas relief does not lie for errors of state law" unless a violation of

20  constitutional rights has occurred).  To establish a due process violation, Smith must

21  show the trial court's ruling was so prejudicial that it rendered his trial fundamentally

22  unfair.  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir, 1996).  The Court must

23  first determine whether the contested evidence was relevant to an essential element in

24  the case, or whether it was improper character evidence used only to show a

25  propensity to commit crimes.  *McKinney v. Rees*, 993 F.2d 1378, 1380-81 (9th Cir.

26  1993).  Here, the introduction of prior bad acts evidence was relevant to prove

27  common design or plan.  As the state appellate court noted, all the incidents involved

28  Smith's use of his position doing shuttle/delivery work to locate female customers

1  who were alone in their homes and attempt to enter their homes needlessly.

2  Accordingly, the jury could draw permissible inferences of a common plan that

3  escalated or was refined by Petitioner over time. *See Boyde v. Brown*, 404 F.3d 1159,

4  1172 (9th Cir. 2005) (explaining admission of evidence violates due process "[o]nly if

5  there are no permissible inferences the jury may draw" from it.).

6         The second determination the Court must make in reviewing admission of

7  evidence for a due process violation is to decide whether the admission of the

8  challenged evidence rendered the trial fundamentally unfair. *McKinney v. Rees*, 993

9  F.2d at 1380.   Here, the state appellate court's explanation of why the prior bad acts

10  evidence was not unduly prejudicial is reasonable.  As the appeals court noted, the

11  2004 and 2005 incidents which constituted the prior bad acts evidence was not as

12  extreme as the rape with which Petitioner was charged.  The likelihood of prejudice

13  was also reduced by the trail court's instruction that the prior bad acts evidence was

14  admitted for a limited purpose.  Specifically, the jury was instructed with CALCRIM

15  375 as follows:

16        "Now, there is another instruction that I need to read to you, and that has to do
       with the evidence involving Ms. Orr-Ziv and Ms. Apgar.  I'll read that
17     instruction to you right now.

18     The People have presented evidence that the Defendant committed another
       offense that was not charged in this case.  It was charged in an earlier case.
19     This the evidence that on a prior occasion, the defendant attacked Ms. Orr-Ziv.
       The People also presented evidence that the Defendant sought to gain admission
20     into the home of Ms. Ashley Apgar claiming that he needed to use the restroom.

21     You may consider this evidence on either of these two subjects only if the
       people have proved by a preponderance of the evidence that the Defendant, in
22     fact, committed either of those incidents.

23     Proof by a preponderance of the evidence is a different burden of proof than
       proof beyond a reasonable doubt.  A fact is proved by a preponderance of the
24     evidence if you conclude that it is more likely than not that the fact is true.  IT's
       a lower burden of proof than a reasonable doubt.

25
       If the People have not met this burden as to the incident involving Ms. Orr-Ziv,
26     you must disregard the evidence of that incident entirely.  If the people have not
       met this burden with respect to the incident regarding Ms. Apgar, you must
27     disregard the evidence as to that incident entirely.  If the people have not met
       this burden as to both incidents, you must disregard the evidence of both
28     incidents entirely.

If you do decide by a preponderance of the evidence that the Defendant committed either or both of these incidents, then you may, but are not required to consider that evidence for the limited purpose of deciding the following: First, did the Defendant have a motive to commit one or more of the offenses or allegations alleged in this case, or did the Defendant have a plan or scheme to commit one or more of the offenses or allegations alleged in this case?

The Orr-Ziv evidence and the Apgar evidence are like separate categories. You first have to decide whether they were proven by this lower burden of preponderance of the evidence. And then if they were decided, you may, but are not required, to use them as evidence for the two purposes that I just mentioned, motive or a plan or scheme.

In evaluating this evidence, consider the similarity between the uncharged offense and act and the charged offenses in this case today. By "charged offenses," we mean the ones in the case today.

Do not consider this evidence for any other purpose. Do not conclude from this evidence that the Defendant has a bad character or is simply disposed to commit crime.

If you conclude that the Defendant committed either of these incidents, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged in this case. The People must still prove each element of every charge in this case beyond a reasonable doubt."

[Lodgment 14 at 1447-1449]

A jury is presumed to understand and follow the trial court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 233-34 (1999); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Petitioner fails to demonstrate the jury considered other crimes evidence for an impermissible purpose despite the trial court's detailed instruction to the contrary. **IT IS THEREFORE RECOMMENDED** the Court find the state appellate court's rejection of Smith's prior bad acts claim on appeal was not contrary to, nor an unreasonable application of, clearly established federal law. Williams, v. Taylor, 529 U.S. 362, 412-13 (2000).

**IT IS FURTHER RECOMMENDED**, as explained in section B, *supra,* of this Report & Recommendation, that neither the exclusion of defense testimony, nor admission of prior bad acts evidence, constituted two or more substantial errors which, when considered in combination, could satisfy the substantial and injurious effect standard. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Thus, **IT IS**

1   **RECOMMENDED** the Court find Smith cannot satisfy the standards for habeas

2   relief on a theory of cumulative error.  Accordingly, relief on Petitioner's cumulative

3   error claim should be **DENIED**.

4   **D.  Ineffective Assistance of Appellate Counsel**

5       Petitioner contends he was denied the Sixth Amendment right to assistance of

6   counsel because his appellate counsel did not raise the trial court's various evidentiary

7   errors on direct appeal.  (Pet. Mem., ECF No. 1 at 8.)

8       Respondent contends because Plaintiff's claims for evidentiary error and

9   cumulative error lack merit, appellate counsel was entitled to exclude those claims on

10  appeal.  (Ans. Mem., ECF No. 25 at 20-21.)

11      Plaintiff raised the ineffective assistance of counsel claim in his first state

12  habeas corpus petition.  [*See* Lodgment 7 and 11.]  The Superior Court denied

13  Plaintiff's Petition on November 23, 2009 finding "appellate counsel was not remiss

14  in not appealing the trial court's purported refusal to permit certain witnesses to testify

15  on Petitioner's behalf."  [Lodgment No. 8 at 3.]  Smith again raised his ineffective

16  assistance of appellate counsel claim in the California court of appeal on December

17  23, 2009. [Lodgment No. 9.]  The state appellate court denied the petition finding

18  Smith had neither "demonstrated that his counsel's performance was deficient; nor ...

19  demonstrated that his appeal would have had a better outcome had counsel raised the

20  issues now presented."  [Lodgment No. 10 at 2.]   On April 28, 2010, Plaintiff filed a

21  petition for habeas corpus with the California Supreme Court.  [Lodgment No. 11.]

22  The California Supreme Court summarily denied the petition on November 23, 2010.

23  [Lodgment No. 12.]  "Where there has been one reasoned state judgment rejecting a

24  federal claim, later unexplained orders upholding that judgment or rejecting the same

25  claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

26      It is clearly established that "[t]he proper standard for evaluating [a] claim that

27  appellate counsel was ineffective . . .  is that enunciated in *Strickland*."  *Smith v.*

28  *Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36

-23-

(1986)).  A petitioner must first show his appellate counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Specifically, Smith must show counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Smith*, 528 U.S. at 285. He must then show he was prejudiced by counsel's errors.  *Strickland*, 466 U.S. at 694.  To establish prejudice, Petitioner must demonstrate he would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.

The Ninth Circuit has observed:

[Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989).

Here, Petitioner is unable to demonstrate that his appellate counsel rendered constitutionally ineffective assistance by failing to present a meritless claim on appeal. *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001); *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991); *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980).  As explained in section B, *supra*, the exclusion of proffered defense testimony from Nurse Caruso, Dr. Adams and Mrs. Smith was permissible under California law and consistent with constitutional due process principles.  As the state court of appeal found, appellate counsel's decision not to raise these meritless issues was not ineffective.  *See Miller*, 882 F.2d at1434*; see also Smith v. Stewart*, 140 F.3d 1263,

1   1274 n.4 (9th Cir. 1998) (explaining counsel is not under an obligation to file "kitchen-

2   sink briefs" on appeal.)

3          In addition, Petitioner has not shown he was prejudiced by appellate counsel's

4   failure to challenge the trial court's evidentiary rulings on appeal.  As the state

5   appellate court found, the exclusion of Nurse Caruso's, Dr. Adams' and Mrs. Smith's

6   testimony did not render Smith's trial fundamentally unfair.  At trial, Petitioner was

7   able to present evidence in support of his defense that the victim's abrasions after

8   sexual intercourse were minor and could have been caused by consensual sex or by

9   activity other than sexual contact.  There is no indication that had appellate counsel

10  raised the exclusion of this defense testimony on appeal, Smith would have prevailed

11  on those claims on appeal.  Accordingly, the Court **RECOMMENDS** finding the state

12  court's adjudication of Smith's ineffective assistance of counsel claim did not involve

13  an unreasonable application of clearly established federal law.  *Strickland*, 466 U.S. at

14  687; *Bailey*, 263 F.3d at 1028; *Featherstone*, 948 F.2d at 1507.  Therefore, **IT IS**

15  **RECOMMENDED** that habeas relief as to Petitioner's ineffective assistance of

16  appellate counsel claim be **DENIED**.

17                                          **VI.**

18                    **CONCLUSION AND RECOMMENDATION**

19         For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

20  Court issue an Order: (1) approving and adopting this Report and Recommendation,

21  and (2) directing that Judgment be entered denying the Petition.

22         **IT IS ORDERED** that no later than **November 5, 2013**, any party to this action

23  may file written objections with the Court and serve a copy on all parties.  The

24  document should be captioned "Objections to Report and Recommendation."

25         **IT IS FURTHER ORDERED** that any reply to the objections shall be filed

26  with the Court and served on all parties no later than **November 19, 2013.**  The parties

27  are advised that failure to file objections with the specified time may waive the right to

28

raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: October 21, 2013

Hon. William McCurine, Jr.
U.S. Magistrate Judge
U.S. District Court

-26-